ABRAHAM ANDERSON

*v.*

ANDERSON FOOD COMPANY.

[Filed March 14th, 1904.]

1. The stockholders of one corporation, by resolution, ordered its directors to buy from another manufacturing corporation "its entire plant, including all of its assets," and to give a purchase-money mortgage upon "its said plant." *Held*, this resolution required the purchasing corporation to give a mortgage covering the entire plant and all of the assets which were purchased under the resolution.

2. A purchase-money mortgage will not be reformed by striking therefrom a clause mortgaging part of the property purchased, on the ground of the alleged mistake of the mortgagor company, that it did not suppose or intend that the mortgage should include that portion of the property purchased; when it appears that the clause in question was intentionally and in good faith inserted by the mortgagor's attorney, that the mortgagee had always in good faith supposed and intended that the purchase-money mortgage should cover all the property purchased (including the part now sought to be excepted), and did not know 'until after the mortgage had been made and delivered, that the mortgagor claimed that the portion of the property purchased now sought to be stricken from the mortgage should have been omitted from it. There is no mutuality in the alleged mistake.

3. Where, in the usual conduct of the business of a manufacturing company the greater portion of its product must be sold outside of the state in which its plant is located, the deposit of about one-tenth of that product in a warehouse outside of the state, and the use of warehouse receipts as collateral to its commercial paper, is a part of the conduct of its ordinary business, within a provision in the company's mortgage, providing that it may "conduct its ordinary business and in so doing dispose of any of the foregoing personal property," and the mortgagee cannot have a removal of the mortgaged goods from the state for such a purpose. enjoined.

On bill, answer and proofs.

The original bill of complaint in this cause was filed by Mr. Anderson, who is the holder of a real estate and chattel mort-

14

Anderson v. Anderson Food Co.

gage against the property of the defendant company, to restrain that company from removing any of the stock, fixtures or personal property referred to in that mortgage, except by selling the same in the conduct of its ordinary business, and also for a mandatory injunction, requiring the defendant to return to its factory in the city of Camden, thirty-five hundred cases of canned tomato soup, alleged to have been wrongfully removed therefrom.

The whole equity of the complainant's bill on which he claims a right to restrain the mortgagor from disposing of the personal property is based upon a single clause in the mortgage.

The instrument in question was made on the 20th day of September, 1901, between the Anderson Food Company (the defendant) and the Anderson Preserving Company. It is a mortgage to secure the payment of $100,000, with interest thereon, at the expiration of ten years from the date thereof, and purports to be a lien upon certain real estate and personal property therein described, one of the items named being the "stock manufactured and unmanufactured, or in process of manufacture," &c. It contains the following clause:

"It, however, being particularly understood and agreed that the party of the first part may conduct its ordinary business, and in so doing dispose of any of the foregoing personal property."

The mortgage has been assigned by the mortgagee to the complainant in this suit.

The bill alleges that the defendant mortgagor has removed large quantities of tomato soup, put up in small tin cans, and has caused the same to be stored outside of the State of New Jersey, and the complainant charges that this stock was not removed in the conduct of its ordinary business but in violation of the chattel mortgage and for the purpose of repledging the same in order to raise money thereon, and that the defendant claims the right to remove and to repledge all of the said stock of said defendant company.

The bill was supported by affidavits, and an order to show cause was allowed why an injunction, restraining the defendant

company in accordance with the prayer of the bill, should not be awarded the complainant.

On the coming in of the order to show cause, the defendant filed its answer, admitting the execution of the mortgage in question and its assignment to the complainant; but alleging that it was signed and delivered by mistake and for want of knowledge of its real contents, contending that, by the terms of the antecedent agreements under which the mortgage was made, it should have been drawn as a security only upon the "plant, appurtenances and equipment" of the defendant company, and that, unknown to the defendant, there was inserted in the mortgage the clause making it a lien upon its "stock manufactured and unmanufactured, and in process of manufacture," and the defendant avers that, immediately on its discovery of the inclusion of its stock in the mortgage, the defendant protested to the complainant that an unfair advantage had been taken and demanded the reformation of the instrument.

The answer admits the removal of the stock as mentioned in the bill, but insists that it was done without any fraudulent intent or purpose and in accordance with the usual custom of the trade in the ordinary course of business for the purpose of raising loans, though it insists that no loan has as yet been made upon said goods, and that it has, under the terms of said mortgage, a lawful right to consign its said goods and obtain loans thereon; and that this course has been, and is, the daily practice of the defendant company and its usual manner of doing business.

In addition to its answer the defendant company filed a cross-bill, alleging that the mortgage in question was made pursuant to certain preliminary agreements, which did not provide for the mortgaging of its stock of goods, &c., in the manner expressed in the chattel mortgage, and that it was never suggested by the complainant, or his attorney, or by any of the parties to the agreement, that the security should cover the stock; but, on the contrary, it was understood and intended that the proposed mortgage should be a lien on the "plant, appurtenances and

equipment" only. That, although it was executed at the office of the complainant's solicitor, in the presence of the president and secretary of the defendant company, in fact, neither of those officers read over the mortgage, nor was it read over to them before executing, nor did the officer who took the deposition thereof make any declaration as to the contents of the mortgage. That the officers of the defendant company, supposing it to be a mortgage only on the "plant, appurtenances and equipment" of the defendant company, executed it in absolute ignorance of its real terms; and the defendant charges that the execution of the mortgage as a lien upon the stock of the defendant company was either a mistake or a grievous wrong and fraud upon the defendant company. The defendant avers that, about three weeks after the mortgage was recorded, it casually discovered that it contained the clause making it a lien upon the defendant's stock of goods, &c. That the defendant's secretary then protested against the same to the complainant and to his attorney. That the secretary and Mr. Beldon, attorney for the defendant mortgagor, examined the record of the chattel mortgage, and found that it did include the stock, &c., and that this was the first knowledge had thereof. The defendant claims that, in person and by letter, it has ever since protested against the inclusion in the mortgage of its stock of goods, and demanded a specific release of those goods from the operation of the mortgage.

The defendant company, under the allegation of its cross-bill, prays that it may be decreed that the mortgage, as executed, is not the act and deed of the defendant company, that the complainant may be compelled to deliver it up for cancellation, or that a decree may be made reforming it by striking out the words "stock manufactured and unmanufactured and in the process of manufacture," or any other words of like import wherever they may occur in the mortgage, and that the record of the mortgage may be amended in accordance with such decree by again recording the same.

The answer of the defendant company was supported by affidavits. A hearing was had on the question whether, in accord-

ance with the prayer of the complainant's bill, a preliminary injunction should go restraining the defendant from further disposing of the stock of canned goods. On that hearing a preliminary injunction was refused to the complainant.

The complainant has answered the defendant's cross-bill. He denies that the stock of goods of the defendant mortgagor was wrongfully inserted in the chattel mortgage, either by mistake or by any fraud or contrivance, and states that the mortgage was made to secure part of the purchase-money to be paid for the conveyance of all the assets of the Anderson Preserving Company to the Anderson Food Company, part of which assets was the stock of goods, &c. The clause of the mortgage respecting the items to be included in the mortgage, which the defendant mortgagor challenges, was drafted by Mr. S. W. Beldon, the attorney for the defendant mortgagor, and included the "stock manufactured, unmanufactured or in process of manufacture," precisely as it is expressed in the chattel mortgage; that it was inserted in the chattel mortgage with the knowledge and assent of said attorney for the defendant mortgagor; that, having been so inserted, it was read in full to Mr. Henderson, the secretary of the defendant mortgagor, who replied that it was "all right." That the mortgage, as so drawn, remained in the possession of the attorney for the defendant mortgagor, and was by him brought, unexecuted, to the office of the attorney for the complainant, for the purpose of execution and settlement. That there were present at that meeting Mr. Beldon, the attorney for the defendant mortgagor; Mr. Cox, its president; Mr. Henderson, its secretary; the complainant and his attorney, Mr. Harned, and the complainant's two sons. That the mortgage containing the clause now challenged was produced by the attorney for the defendant mortgagor. That attention was openly called to the fact that it was a chattel mortgage, that an affidavit of consideration was in the presence of the parties dictated, and was annexed to the mortgage by the attorney for the defendant mortgagor, and that it was, then and there, openly declared to all the parties present that the instrument was a mortgage upon the real and personal property about to be

transferred from the Anderson Preserving Company to the defendant mortgagor, to secure $100,000 of the purchase price of the property mortgaged, and that thereupon the officers of the defendant mortgagor executed the mortgage in question with full knowledge of its contents and so delivered it.

On these pleadings the cause has come to final hearing.

*Mr. John F. Harned* and *Mr. Joseph H. Gaskill,* for the complainant.

*Mr. Schuyler C. Woodhull, Mr. Samuel W. Beldon* and *Mr. David J. Pancoast,* for the defendant.

GREY, V. C.

The first question to be determined in this cause is that raised by the defendant's cross-bill, seeking to cancel the chattel mortgage set up in the complainant's original bill of complaint or to reform it by striking out the words "stock manufactured, unmanufactured and in the process of manufacture." If the defendant is entitled to this relief, it will so alter the chattel mortgage upon which the complainant bases his equity that he could not be entitled to any injunction which would restrain the defendant mortgagor company from removing and pledging the stock of canned goods, &c., now included within the chattel mortgage. Has the defendant mortgagor shown that its chattel mortgage, as it is now expressed, was made to include the clause affecting the stock of goods by either fraudulent contrivance, or by such a mistake as is correctible by this court?

I think it may be safely said that there is not a particle of evidence in this cause which either shows or tends to show that the mortgagee, the Anderson Preserving Company, or those who acted for it, either as its officers or attorney, ever had any purpose, or even thought of fraudulently introducing the clause in question into the chattel mortgage, and obtaining it to be executed by the defendant mortgagor company, or those who acted for it, without its knowledge or consent. All of the evidence touching the execution of the instrument goes to show that

it came into existence with the clause in question, not by the contrivance or planning of the mortgagee, or those who acted for it, but that the whole mortgage was a subject of conference and examination, at first, between the several attorneys of the mortgagor and the mortgagee; that the challenged clause was particularly referred to between those attorneys before it was inserted in the chattel mortgage, and the draft of that clause was actually made by the attorney for the defendant mortgagor. The instrument was thereafter, by the consent of all parties, retained in his possession unexecuted, with the most abundant opportunity for inspection, correction, change or rejection. It was yet unsigned when brought to the place of meeting for settlement by the attorney for the mortgagor company, and although there is some contradiction as to the definite words used in making known the contents of the instrument at the time it was signed, acknowledged, proven and delivered, yet I am satisfied that its contents were in fact then and there declared and made known in good faith to the parties who, acting for the defendant mortgagor, executed it, and those who acted for the defendant mortgagee accepted it, as it is presently expressed.

So far as the cross-bill charges or intimates that the mortgagee, or those who acted for it, had any fraudulent intent to insert in that mortgage the clause which the defendant mortgagor now seeks to have excised, or that it was inserted by any fraudulent contrivance, the evidence entirely fails to sustain the allegation.

There is a prayer in the cross-bill which should be shortly noticed. It is asked, as an alternative mode of relief, that the complainant may be compelled to deliver up the chattel mortgage for cancellation. A decree that the mortgage shall be canceled is impossible under the circumstances of this case. This would require a restoration of the *status* of the parties which existed when the mortgage was delivered which the cross-bill does not tender. There is nowhere in this case any offer to return to the mortgagee the property which the mortgagor purchased. The evidence shows that this is probably impossible. All parties, since the mortgage was given, have irretrievably

changed their positions touching the subject-matter then dealt with. No claim has been made in argument that a cancellation of the mortgage is equitably possible, and this mode of relief must be rejected.

The cross-bill also asks that the chattel mortgage may be reformed by striking therefrom the clause "stock manufactured or unmanufactured and in the process of manufacture," or any other words of like import wherever they may occur in the mortgage, because it is alleged those words were inserted in the mortgage by a mistake.

The mortgage in question came to be made as follows: The complainant, Mr. Abraham Anderson, was the largest stockholder, so that he entirely controlled the Anderson Preserving Company, which in the year 1901 was engaged in the packing of fruits and vegetables in cans, and the sale of the same. Mr. Anderson and Mr. John T. Cox, in the latter part of the summer of that year, entered into negotiations for the sale by Mr. Anderson of the Anderson Preserving Company to a company, not yet incorporated, to be known as the Anderson Food Company, which would be controlled and managed by Mr. Cox.

Several written agreements were made between Mr. Anderson and Mr. Cox, which, because of disagreements between them, were abrogated, and new contracts made in their stead.

Before the parties had come to an abiding agreement the Anderson Food Company was, on August 15th, 1901, incorporated by Mr. Cox, who subscribed for eight shares as an incorporator; Mr. David A. Henderson, who subscribed for one share, and Mr. Voorhees S. Anderson, who also subscribed for one share. The whole trend of the evidence in the cause shows that the Anderson Food Company was incorporated and controlled by Mr. Cox for the purpose of taking over all of the assets of the Anderson Preserving Company. Mr. Cox elected himself president of the Anderson Food Company; Mr. Henderson, secretary, and Mr. Voorhees S. Anderson, treasurer.

There were several recessions and changes, and perhaps temporary abandonments of the plan, but the negotiations were as often resumed between the parties.

Anderson *v.* Anderson Food Co.

The first action taken by the newly-organized Anderson Food Company, the mortgagor, looking towards the taking over of the property of the Preserving Company, was, by a resolution of the stockholders of the Anderson Food Company, adopted by them at a stockholders' meeting held on September 5th, 1901. The resolution is as follows:

"Upon motion, it was resolved and ordered that the board of directors be authorized to purchase from the Anderson Preserving Company *its entire plant, including all of its assets,* and subject to its liabilities, for a consideration of $1,000 in cash, $149,000 in capital stock for this Anderson Food Company, and a bond and mortgage be given by this Anderson Food Company *upon said plant* for the sum of $100,000, payable at the expiration of 10 years, with interest at the rate of 5% per annum."

It will be noted that this resolution, in speaking of the thing to be purchased, refers to the *entire plant of the Anderson Preserving Company, including all of the assets,* and to *a bond and mortgage to be given* by the Anderson Food Company *upon said plant.* It is the fair construction of this resolution that the stockholders of the food company, in directing the making of the mortgage in question (obviously a purchase-money mortgage), intended and expected that the mortgage which they directed to be given upon *"said plant"* referred to the previously-mentioned preserving company's *"entire plant, including all of its assets."* That accords with the recitals of the mortgage itself, which declare it to be "given to secure a part of the purchase-money of the said real estate and personal property."

It should be observed that this resolution of the stockholders of the mortgagor company continued in force up to and at the time when the mortgage in question, including the clause now challenged, was executed and delivered.

On the same September 5th *the directors of* the Anderson Food Company adopted a resolution that the Anderson Food Company purchase the plant and assets of the Anderson Preserving Company, and *"make the mortgage authorized by the stockholders,"* and authorizing the proper officers of the food company to execute said bond and mortgage. On September

16th, 1901, the directors rescinded their resolution of September 5th, but the stockholders' resolution of the same date was never rescinded. Negotiations appear to have been again broken off and renewed between the parties after the food company directors had rescinded their purchase resolution of September 5th, 1901, for there are several later agreements which were abandoned.

Finally, on the 20th of September, 1901 (the same day on which the purchase and giving of the mortgage were concluded), the board of directors of the Anderson Food Company readopted a resolution to purchase, under which the mortgage now criticised was made. The reinstating resolution of the directors is as follows:

"The president stated that this meeting was called to take action with a view of purchasing the plant of the Anderson Preserving Company, and upon motion it was ordered that the board of directors purchase the plant and assets of the Anderson Preserving Company and issue therefor $149,000 in capital stock, pay $1,000 in cash, and *make the mortgage authorized by the stockholders* of $100,000 to the Anderson Preserving Company, and the proper officers are authorized to execute said mortgage."

This was the final action of the board of directors respecting the matter of the purchase and execution of the mortgage. It should be noted that this directors' resolution, like the previous one, refers to the stockholders' resolution, as fixing the character of the mortgage which was to be given, that is, as is above shown, *a mortgage upon the entire plant of the Anderson Preserving Company, including all its assets.*

These resolutions and agreements to purchase, &c., Mr. Cox and Mr. Anderson appear to have referred to their respective attorneys. Mr. Anderson's attorney was Mr. John F. Harned, who acted for him and the preserving company. Mr. Cox's attorney was Mr. Samuel W. Beldon. Mr. Henderson conducted the active part of the negotiations for Mr. Cox. Mr. Henderson testifies that Mr. Beldon was employed by the Anderson Food Company to draw all the papers.

Mr. Henderson and Mr. Cox, with Mr. S. W. Beldon as their

counsel; Mr. Abraham Anderson, and Mr. John F. Harned as his counsel, and Mr. Anderson's two sons, met on the 20th day of September, 1901, at Mr. Harned's office for the execution of the conveyances and mortgage in question and the settlement to be made of the transaction. Previous to this meeting the deed and bill of sale from the Anderson Preserving Company to the Anderson Food Company, and the mortgage now criticised, had been drawn by or under the supervision of Mr. Beldon, the attorney for the Anderson Food Company, so as to be ready for execution on the 20th of September, 1901. The bill of sale included all of the chattels and personal property belonging to the Anderson Preserving Company, and specially, among other items, the "stock manufactured or unmanufactured, or in process of manufacture." The words "stock manufactured and unmanufactured and in process of manufacture," Mr. Beldon says, were included in the mortgage after a conference with Mr. Harned, and he thinks, but cannot positively say, that there was some independent action of his own touching that clause. Mr. Beldon testifies that "so far as the consummation of the matter is concerned, I was practically its engineer, and in consequence of that I drew the papers." The mortgage, he says, was drawn in his office, under his supervision and direction, including that part of the mortgage which is now in dispute in this case. Mr. Beldon also says that his impression is that the papers, while yet unexecuted, were left with Mr. Henderson, but he cannot be sure that the mortgage was one of those papers. Mr. Beldon also testifies that after a conversation with Mr. Harned, he, Mr. Beldon, took the bill of sale (which conveyed the personal property to the Anderson Food Company) and dictated the portion referring to the personal property which was to be included in the mortgage; and, speaking of the papers in question, which he had thus prepared, Mr. Beldon says: "I don't think it is possible that papers of this importance would have gone out of my office without having been read by me, either every word or substantially through."

Mr. Cox and Mr. Henderson both deny that the contents of the mortgage were made known at the time of its execution.

Mr. Beldon says, regarding the mortgage, that he cannot say that he has any extremely distinct recollection of the execution of the mortgage, but that, according to the best of his recollection, it was not read to Messrs. Cox and Henderson by him, or in his presence, before its execution. Messrs. Cox and Henderson also say that neither they, nor any officer of the Anderson Food Company, to their knowledge, ever consented to the inclusion of the goods and chattels and the personal property of the company in the mortgage.

Mr. Cox testifies that the protest that he makes is, that the mortgage includes in it the stock manufactured and unmanufactured, or in process of manufacture, and that he thinks the mortgage in all other particulars to be correct. Mr. Henderson, however, seems to contend that the mortgage ought not to have included any chattels whatever. That is the tenor of his letter of November 11th, 1901, to Mr. Anderson and of his present testimony.

These gentlemen, representing the defendant company, do not seem to agree as to what was actually intended and understood by them to have been included with the mortgage. Mr. Henderson appears to object at one time to including any chattels within the mortgage, and at another time, by his later letter of March 10th, 1902, he only objects to the including the specific chattels, the stock, &c. Mr. Cox objects only to the inclusion of the stock and makes no objection to the other chattels named in the mortgage.

Mr. Harned's testimony agrees with that of Mr. Beldon, that the deed, the bill of sale and the mortgage were prepared by Mr. Beldon. While they were in course of preparation, he called on Mr. Beldon and the following conversation took place between them. Mr. Harned says:

"We took up the subject of inserting in the mortgage a description of the personal property. I told him [Beldon] that I understood that under a fair interpretation of the intention of the parties it [the mortgage] was to cover the property that was being sold; that it was necessary to give any validity to the mortgage; it would necessarily have to be a purchase-money mortgage, as no money was passing between the parties, only property, and that it should cover the property that

was actually being transferred; he agreed with me in that; he understood that to be the intention of the parties, and called a stenographer, picked up the bill of sale, which he had lying with the other papers, and read from the bill of sale a description of the personal property in the bill of sale and directed that that be inserted in the mortgage; he then said that a mortgage of that kind would interfere with the management of the business unless they were authorized in some way to dispose of it; I said that seems reasonable, and then he added the form authorizing the disposal of the property in the ordinary course of business, remarking at the time that he had some kind of a form of his own that he used in those cases."

I do not understand Mr. Beldon's testimony to contradict this testimony of Mr. Harned as to the manner in which the clause which is now questioned came to be inserted in the mortgage. There are portions of it which Mr. Beldon says he does not recall.

Mr. Harned further narrates the manner in which these papers, having been prepared by Mr. Beldon, were executed. Mr. Harned testifies that in the presence of Mr. Cox, Mr. Henderson and Mr. Beldon, he held up the bond and mortgage, and said that it was a purchase-money bond and mortgage upon the real estate and personal property that had just been transferred by the preserving company to the food company. The mortgage was then proven by the affidavit of Mr. Henderson, as secretary of the food company, Mr. Harned taking his affidavit as master.

I do not understand the testimony of Mr. Beldon to contradict this narrative of Mr. Harned as to the mode in which the chattel mortgage in question was executed. Mr. Beldon says he knew the paper was a chattel mortgage; knew that as such it required an affidavit.

The foregoing narrative of the evidence shows that the mortgage in question was drawn by the defendant company's own attorney as a purchase-money chattel mortgage, and the very clause regarding the stock, &c., which the defendant now seeks to strike out was specially considered and inserted by that attorney because he agreed that it was understood to be the intention of the parties. The mortgage, after it was so drawn and before it was executed, was in all probability left with Mr.

Anderson *v*. Anderson Food Co.

Henderson, the defendant's acting business man, for examination and approval. Its contents were openly declared in the presence of all the parties and their attorneys at the time it was executed, and its execution was proven by the same Mr. Henderson, by his sworn affidavit annexed to the mortgage.

Is it reasonable to declare that a paper so prepared, examined, considered and approved was executed in mistake?

There certainly was no mutuality in any mistake. Mr. Anderson declares he made no mistake. The Anderson Preserving Company got what it expected—a purchase-money mortgage for a part only of the price upon all the property which it conveyed. Mr. Anderson swears he never agreed to accept, nor would he have accepted, anything else than a mortgage which covered the whole of the property which was conveyed by the preserving company to the food company.

Before the preserving company's sale, all its stockholders, including Mr. Cox as one, gave a written consent. Mr. Henderson witnessed it. It is in these words:

"We, the undersigned, all of the stockholders of the Anderson Preserving Company, do hereby agree and consent to a sale by the Anderson Preserving Company of all its personal property and real estate, buildings, improvements, good will, stock, fixtures, machinery and assets to the Anderson Food Company, for the sum of $250,000, and to receive back in part payment therefor a purchase-money mortgage of $100,000 upon the Anderson Food Company assuming all the indebtedness and obligations of the Anderson Preserving Company.

"JOHN T. COX,
"V. S. ANDERSON,
"A. ANDERSON,
"L. W. GOLDY,
"R. L. ANDERSON."
"Witness—DAVID A. HENDERSON."

On obtaining the written consent of its stockholders, the preserving company adopted this resolution:

"*Resolved*, That this company sell to the Anderson Food Company all its personal property and real estate, buildings, improvements, good will, fixtures, machinery and assets, for the sum or price of two hundred and fifty thousand dollars, one hundred thousand dollars of which is to be paid *by a purchase-money mortgage upon the property* above

Anderson *v.* Anderson Food Co.

sold; one thousand in cash, and one hundred and forty-nine thousand dollars in stock of the Anderson Food Company at par, upon the Anderson Food Company assuming all the indebtedness and obligations of the Anderson Preserving Company.

"*Resolved,* That the officers of this company be and they are hereby directed to carry out the terms of this resolution.

"*Resolved,* That the mortgage of $100,000 made by the Anderson Food Company to the Anderson Preserving Company, when executed, be assigned to Abraham Anderson, in payment to him for one thousand shares of the capital stock of this company by him held and surrendered."

It is very difficult to believe that Mr. Cox, who consented in writing that the Preserving Company should have a purchase-money mortgage of $100,000 upon the Anderson Food Company, was under a mistake in giving for the food company precisely such a mortgage to the preserving company. Yet that is what he presently claims was done.

The preserving company's sale, as is shown by its above-quoted resolution, was to be made on the terms that it was to be paid in part "*by a purchase-money mortgage upon the property above sold.*"

The defendants make their claim of a mistake because in collateral agreements made between Mr. Anderson and Mr. Cox, not between the mortgagor and mortgagee companies, the reference to the mortgage to be made, did not specifically mention that it was to be a purchase-money mortgage upon all the goods sold. These collateral agreements of the individual parties certainly cannot be permitted to alter the terms of the corporate contracts executed with all the formalities pursuant to written resolutions of the contracting companies.

In *Aller* v. *Crouter, 19 Dick. Ch. Rep. 381,* Chancellor Magie declared that reformation of a conveyance will not be decreed except on clear proof that by *mutual mistake of the parties thereto* the conveyance expresses something which they did not intend, or omits to express something which they did intend.

In the present case there is scarcely a pretence that there was any mutuality in the alleged mistake. The above-quoted resolutions of the respective acting companies show that both intended to make the mortgage what it presently is.

Anderson v. Anderson Food Co.

The defendant mortgagor has proven no such certainty of mistake or agreement of its own witnesses of what was intended to be done as will support a decree of reformation. Courts of equity do not grant the high remedy of reformation upon a probability, or even upon a mere preponderance of evidence, but only upon a certainty of the error. *2 Pom. Eq. Jur.* § *859; 1 Story Eq. Jur.* § *157.* The weight of the evidence tends to show that the instrument challenged does in fact, in the particular in which it is criticised, express what the parties thereto intended it should, when it·was made and delivered.

The cross-bill must therefore be dismissed.

The mortgage remaining unchanged and forceful as a lien upon the personal property of the defendant mortgagor, it is still to be considered whether the complainant is, on his original bill, entitled to restrain the defendant from removing any of that personal property, &c., according to the prayer of his bill.

The clause under which the defendant justifies its removal of the cases of tomato soup referred to in the bill of complaint, is as follows:

"It, however, being particularly understood and agreed that the party of the first part may conduct its ordinary business, and in so doing dispose of any of the foregoing personal property."

Under this clause the defendant company admits that it had deposited a portion of its manufactured goods in warehouses outside of the State of New Jersey, and that it intends to raise money thereon by using warehouse receipts as collateral to its commercial paper.

The question turns in great part upon the meaning of the words "conduct of its ordinary business." These do not relate, as has been argued for the complainant, to the business previously done on the same premises by the Anderson Preserving Company. The context shows that it is the business of the party of the first part, the Anderson Food Company, which is referred to. When the mortgage was made, this company had never conducted any business. Therefore, the permission authorizes the mortgagor to conduct such ordinary business as it

might do in the future. Necessarily, the character of the business to be done must be regulated by its nature, and the persons with whom and the places where, and the circumstances under which it must in the future be conducted.

It clearly appears that the quantity of canned goods produced by the mortgagor was so great that it was impossible that all or even a major part of them could be sold or disposed of in this state. The places of sales of such products were practically the whole of the United States. In conducting such a business there would naturally and ordinarily be periods when sales would be very slow and prices low, and when at the same time cash money must necessarily be instantly had. Such a condition of affairs would seem to invite the holder of a stock of such goods to store them and use the storage receipts as a means of temporarily raising the needed cash. When prices revived and sales again became brisk, the goods thus saved from compulsory sacrifice might be advantageously disposed of.

This was almost precisely the situation which has provoked the complainant's action. He insists that by the terms of the mortgage the defendant mortgagor can only dispose of the stock by an absolute sale. This course would much more effectually take the goods from the complainant's control than would a pledging of them. Under the circumstances above noted, it might ruin the defendant's business.

The proof is substantially undenied that the course pursued by the defendant was free from any fraudulent intent to remove the goods. Only about one-tenth of the stock was stored. There was a sudden exigency, and no cash. The course taken was the usual one among manufacturers who have more stock on hand than money at call.

It must be held that the disposal made of the cases of tomato soup by the defendant was in the conduct of its ordinary business. The complainant's original bill of complaint must therefore be dismissed.