## SLOSS–SHEFFIELD STEEL AND IRON COMPANY

*v.*

## ÆTNA LIFE INSURANCE COMPANY.

[Submitted May 18th, 1908. Decided June 2d, 1908.]

1. An insurance company designated an agent a "general agent," who so advertised, by means of letter-heads and otherwise. The agent negotiated for, wrote, and delivered a policy. Insured did not know that the agent did not have the power, as shown by his apparent authority as general agent, to make contracts and fix the terms thereof. A telegram and letter from the company to the agent, and exhibited to insured, confirmed the opinion of insured that the agent had full authority.—*Held,* that insured might treat with the agent on the theory that he was a general agent with the power to fix the terms of contracts of insurance.

2. A clause in a policy that no condition or provision therein shall be waived or altered, except by written endorsement attached thereto, and signed by the officers of insurer, does not prevent a general agent from making a contract of insurance outside of the matters written and printed on the face of the policy itself, since the clause is directed against a waiver of provisions, or alterations, of a contract in existence, and which has become a binding obligation between the parties.

3. Where the issue raises the question what really were the terms of a contract which has been reduced to writing, parol evidence is admissible.

4. Contracts may be reformed by equity when, by reason of mutual mistake, the instrument fails to express the agreement on which the minds of the parties met, or where there is mistake by one of the parties, or fraud, or other inequity, on the part of the other.

5. A contract of insurance may, in a proper case, be reformed, and made to accord with the real agreement entered into between insured and the general agent of insurer.

6. Where a written contract of insurance was not the contract made by insured and the general agent of insurer, and insured, though knowing that the policy as written did not accord with the agreement as made, had the right to rely on the representations made by the general agent, and was led to believe that the misstatement in the policy was merely formal, and could not be taken advantage of by insurer, equity can reform the policy, since insured either acted under an erroneous conviction in accepting the policy containing the terms not agreed on, or he was imposed on, and became a victim of misplaced confidence; the word "mistake" being defined to be either the doing of an act under an erroneous conviction, which act, but for such conviction, would not have been done, or some intentional act or omission or error, arising from ignorance, surprise, imposition, or misplaced confidence.

On final hearing on bill, answer, replication and proofs.

The bill of complaint in this case is filed by the Sloss-Sheffield Steel and Iron Company, a New Jersey corporation, against the Ætna Life Insurance Company, a Connecticut corporation, engaged, among other things, in issuing policies of the class known as employers' liability insurance policies, primarily to reform seven policies of liability insurance issued by the defendant to the complainant, and incidentally to enjoin the insurance company from prosecuting an action in the New Jersey supreme court to recover an excess of premiums which it claims has accrued on the policies during the years 1905 and 1906. The case turns on the authority of an agent of the insurance company, located at Birmingham, Alabama, it being claimed by the as-

sured that the agency was of a general and unlimited character, and by the insurance company that it was limited to soliciting for business and to the delivery of policies and the collection of the premiums. The agency which the insurance company had established was conferred upon the Alabama Real Estate and Insurance Company, of which, in 1904, one A. M. Hobson was president. This Alabama corporation at that time was advertising itself as the general agent of the insurance company. Letterheads were provided on which was printed the name of the insurance company and the fact that the Alabama corporation was its general agent. The Alabama corporation likewise occupied offices in an office building in the city of Birmingham, and on the entrance doors thereto were printed similar advertisements of the general agency of this corporation for the insurance company. There was nothing to indicate the fact that there was any limitation on the scope of the agency, nor was there during all the negotiations hereinafter mentioned any special notice given to the assured that the so-called general agents did not have the general authority necessary for the transaction of the business which the insurance company had entrusted to it. On May 18th, 1904, the vice-president and general manager of the assured received a letter from the Alabama corporation, which reads as follows:

"If consistent we will call on you in the morning (19th inst.) in re your employers' liability insurance. We have a special inducement to offer for the above company, and hope to secure this business. Yours truly, Alabama Real Estate & Insurance Company, by A. Mabon Hobson, President."

This letter was written on a sheet of paper, at the head of which was a printed advertisement containing the names of the president, secretary and assistant secretary of the insurance company, and the words: "Accident and Liability Department, Ætna Life Insurance Company of Hartford, Conn.," and the further words, "Alabama Real Estate and Ins. Co., General Agents, A. Mabon Hobson, President; Geo. A. Smith, Manager; M. Porter Walker, Secretary and Treasurer, 221-222 First National Bank Building."

The assured by its vice-president replied to this letter on June 13th, 1904 (having in the meantime had a conversation with Mr. Hobson), in which reply he asked the Alabama corporation to quote the best rates at which it could carry its employers' liability insurance for one year on an estimated payroll, the figures concerning which were given.

Considerable further negotiation ensued which was carried on by the Alabama corporation from the Birmingham office by the so-called general agents, all the correspondence being written upon paper with printed letter-heads of the character hereinabove mentioned. There was nothing during these days of bargaining disclosed to the steel company which would indicate to the mind of its manager that the Alabama corporation did not have the power to conduct the negotiation, to fix the terms of the contract and to close the transaction without reference to the home office. It is true that the Alabama corporation reported its bargaining to the home office of the insurance company and was instructed by telegram as early as June 20th, 1904, to decline to issue policies at a less rate than that which was established and set out in the manual of rates issued from the company's office, but it does not appear that this notice ever came to the attention of the steel company, and I do not think, therefore, that it can affect the situation as between the steel company and the insurance company. The policies were issued on June 24th, 1904, on printed blanks, on and at the foot of which were printed the names of Walter C. Faxon, secretary, and M. G. Bulkley, president. Under the printed signature of the president appears that of the Alabama corporation, its name being impressed upon the paper with a rubber stamp, the only writing being the name of A. Mabon Hobson, president, written over the words "General Agent." These policies on their face appear to be at the rate of $10,502.10 premium for one year on an estimated payroll of $1,400,000; that is to say, the premium was fixed at $10,502.10 as the sum which the assured would have been obliged to pay under the terms of the policies for the one year's protection. The sum which actually was paid, however, was $8,506.88, this sum having been fixed by the agreement between the assured and the so-called general agents of the insurance company. So far as

appears the insurance company permitted its agents to carry
through this transaction without notice of the agent's inca-
pacity, and under such circumstances and with such general ap-
pearances as to satisfy the steel company that the agents had the
most ample power to do what they were doing. Mr. McQueen,
the vice-president of the steel company, testifies that at the time
the transaction was closed on June 24th, Mr. Hobson, the presi-
dent of the Alabama corporation, stated most positively that the
amount which the assured would be obliged to pay on the esti-
mated payroll before them was $8,506.88, and that the reason
why a different amount was written in the policies was that the
policy rates were what are called manual rates that had been
fixed by an agreement between the companies issuing liability
policies and related to business to be written in different dis-
tricts or in different lines of business, and that competition was
keen, and that this was a desirable risk, and that the Alabama
corporation was authorized to take it. There is one other cir-
cumstance attending the delivery of the policies which throws
light upon the manner in which the steel company dealt with
the so-called general agents. When Mr. Hobson tendered the
policies there was attached thereto a rider giving the assured
the privilege of renewing the policies for three years at the same
rate. The president of the assured who was present at the time
of the delivery stated that he did not care to have the matter
complicated, and that he would not receive the policies with
the riders, whereupon these riders were then and there detached
and delivered back to the president of the general agent. Just
before these policies expired in 1905 the general agency of the
Alabama corporation seems to have been revoked and the firm
of Walker & Egleston to have been appointed instead. Mr.
Walker of that firm had been secretary of the Alabama Real
Estate and Insurance Company, the predecessors of the firm of
Walker & Egleston. On June 12th, 1905, J. S. Rowe, assistant
secretary of the insurance company under whose general super-
intendence the employers' liability insurance business was car-
ried on, sent a telegram to Walker & Egleston in these words:
"Endeavor renew Sloss last year's rates on three-year contract.
Waive application new coal mine rates this risk." And at the

640 CASES IN CHANCERY.

Sloss-Sheffield Steel & Iron Co. v. Ætna Life Ins. Co. 74 Eq.

same time he wrote a letter to Walker & Egleston, addressing them as general agents. The letter is important, and is here copied at length.

"ÆTNA LIFE INSURANCE CO.,

"HARTFORD, CONN., June 12th, 1905.

"Walker & Egleston, G/A.

"Re. Renewal Sloss Sheffield S. & I. Co.

"GENTLEMEN—Referring to above risk which is now up for renewal, we to-day wired you as follows which is hereby confirmed:

"'Endeavor renew Sloss last year's rates on three years contract. Waive application new coal mine rates this risk.'

"You will observe that we have suggested that you endeavor to obtain renewal of this risk on a three year basis, in order that same may be removed from annual competition.

"Yours truly,

"(Sgd)   J. S. ROWE, Sect'y."

About June 15th, Mr. Walker, one of the general agents, called upon the vice-president of the steel company and exhibited to him the telegram from Mr. Rowe of June 12th, and at the same time, or at another time, the witness did not distinctly remember, Mr. Walker showed him the letter from Mr. Rowe of the same date, and in the conversation which followed Mr. Walker told Mr. McQueen that he could renew the insurance for three years at the same rate at which it had been written for the previous year, and that he would give the steel company the privilege of canceling the policies at the end of the first year upon payment of two and one-half per cent. more, making $8,725, or, in other words, that he would write the policies for $8,725 for one year on the estimated payroll, and would deduct therefrom two and one-half per cent., bringing the premium down to $8,506.88, provided the policies should run for three years. This offer was put in writing, signed by Mr. Walker as general agent and sent to Mr. McQueen, the vice-president of the steel company. The letter is as following:

"BIRMINGHAM, ALA., June 20, 1905.

"Mr. J. W. McQueen, Vice Prest.,

"Sloss Sheffield Steel & Iron Company, City.

"DEAR SIR—We are in receipt of your favor of June 15th, also your supplementary letter of June 19th, in reference to your company's Employers' Liability Insurance for one year, and in reply thereto we beg

to quote you a net price of $8,725.00 on a payroll of $1,400,000.00, divided as follows:

| | | |
|---|---:|---|
| Furnaces | $330,000 | 00 |
| Machine shops | 25,000 | 00 |
| Coal mines (including convicts) | 600,000 | 00 |
| Coke ovens | 175,000 | 00 |
| Quarry | 20,000 | 00 |
| Red ore mines (slope) | 150,000 | 00 |
| Brown ore mines (surface) | 100,000 | 00 |
| | $1,400,000 | 00 |

"If your company will enter into an agreement to carry this insurance with the Ætna Life Insurance Company for three years, we will allow you a discount of 2½ per cent. from the price of one year, or $8,506.88, practically the same figures at which the business was written last year, subject to cancellation at your election after the first year by paying the difference between the price for one year and the price for three years.

"We have every reason to believe that our present adjusting arrangement for attorneys, which has proven so satisfactory, will continue, and assure you that should we rewrite your policies, no effort will be spared to take the same good care of you in the future as we have in the past.

"Yours very truly,

"M. PORTER WALKER,

"*General Agent.*

"*Ætna Life Insurance Company of Hartford, Conn.*"

The terms offered by this letter were accepted by the assured, and later on the policies were delivered. The aggregate amount of the premiums provided for in the 1905 policies was $10,502.10, the same as the year before. Nevertheless, the general agents rendered a bill to the assured for $8,506.88, which was also the same as the year before, and this was paid by the assured to the general agents on August 17th, 1905, by a check which with the receipt for the same was produced.

It appears now that the negotiations between the general agent and the assured were never truly reported by the general agent to its principal, the insurance company at Hartford; that the insurance company was not informed of the fact that the premiums received were at a rate less than the manual rates, and that whatever reduction in the premiums there were, came out of the agents' commissions and not out of the portion of the pre-

642 CASES IN CHANCERY.

Sloss-Sheffield Steel & Iron Co. v. Ætna Life Ins. Co. 74 Eq.

mium which was payable to the company, and that the general agent disregarded the positive directions of the insurance company touching this particular risk.

The steel company canceled these 1905 policies at the end of the year, and the insurance company then brought a suit in the supreme court for the premium which would be due under the policies as they were written, i. e., at the high rate, but calculated at the short rates mentioned in the policies.

*Mr. Frederick J. Faulks,* for the complainant.

*Messrs. James & Malcolm G. Buchanan,* for the defendant.

HOWELL, V. C.

From the circumstances above detailed I do not hesitate to declare that the insurance company held out the persons whom it designated as its general agents as agents qualified not only to solicit business, but also to make contracts which would be binding on it. The 1904 policies were negotiated for, written and delivered by these general agents who had apparent authority; and secret instructions from the principal, not communicated to the other party, are entirely overriden by the apparent authority deducible from the circumstances. Again, these agents were not denominated special agents; the appellation given to them was of much broader significance. Anyone dealing with them, knowing that they were general agents and seeing the manner in which they transacted the business, would be naturally led to the belief that they had full authority to transact each and every part of the business in hand. This view is confirmed by the exhibition to the insured of the letter and telegram of June 12th, 1905, which had a tendency to confirm the opinion that the assured had previously derived from their manner of dealing that they had full and ample authority to make original contracts. The case is within the rule laid down by Mr. Justice Van Syckel in the court of errors and appeals in the case of *Millville Mutual Co.* v. *Building and Loan Association, 43 N. J. Law (14 Vr.) 643.* He quotes from *Story Ag.* § 19:

"On the other hand (although this is not the ordinary commercial sense) a person is sometimes said to be a special agent, whose authority, although it extends to do acts generally in a particular business or employment. is yet qualified and restrained by limitations, conditions and instructions of a special nature. In such a case the agent is deemed, as to persons dealing with him in ignorance of such special limitations to be a general agent; although as between himself and his principal, he may be deemed a special agent. In short, the true distinction (as generally recognized) between a general and special agent is this: A general agency does not import an unqualified authority. but that which is derived from a multitude of instances, or in the general course of an employment or business; whereas a special agency is confined to an individual transaction.

"Such general authority enables the agent to bind the principal, without orders, in dealing with those who, acting in good faith, have. no notice of the want of lawful power in the agent.               (

"One who entrusts authority to another is bound by all that is done by the agent within the scope of his apparent power, and cannot screen himself from the consequences thereof upon the ground that no authority was given to do the particular act."

A case similar to the one in hand is *Smith & Wallace* v. *Prussian National Insurance Co., 68 N. J. Law (39 Vr.) 674,* where the question was as to the authority of an agent to make an original contract of insurance. The insured applied to one Vanderveer, an agent, for insurance on its warehouse. The agent, who appears to have been as between him and his employer, a special agent, wrote what is known in insurance circles as a binder, and delivered it to the insured. A question arose about the rate to be charged for the insurance, and this question was left in abeyance for a short time, during which the building burned. The question was whether the agent had made a contract of insurance or not. Mr. Justice Garretson says: "It is admitted that Vanderveer was the agent of the company appointed by a regular commission and authority from them signed by the manager. As such agent he had signed the binding slip in question, and did so within the limits of his authority as an agent to countersign and issue policies. His authority to enter into the contract in question for the insurance company will be inferred from his general agency." *Gulick* v. *Grover, 31 N. J. Law (2 Vr.) 182; Perkins* v. *Washington Insurance Co., 4 Cow. 645; Brown* v. *Franklin Insurance Co., 165 Mass. 565.*

The Alabama cases are to the same effect. *Piedmont Insurance Co.* v. *Young, 58 Ala. 476; Robinson* v. *Ætna Insurance Co., 30 So. Rep. 665; Triple Link Indemnity Alps* v. *Williams, 26 So. Rep. 19; Birmingham Mineral Railway Co.* v. *Tennessee Coal and Iron Co., 127 Ala. 137.*

It is argued on behalf of the insurance company that clause N in the policy prevents the making of any contract by the general agent beyond and outside of the matters which are written and printed on the face of the policy itself. The clause in question reads as follows:

"No condition or provision of this policy shall be waived or altered except by written endorsement attached hereto and signed by the president and vice president, secretary or assistant secretary of the company, nor shall notice to any agent, nor shall knowledge possessed by an agent or by any other person be held to effect a waiver or change in any part of this contract."

In further support of this contention defendant cites the time-honored rule that parol evidence shall not be admitted to vary or contradict the written instrument, with a long line of cases from our own courts and elsewhere as authority for the proposition that an agent without express authority may not waive or alter the provisions of the contract. I think that the clause itself and the cases referred to are not applicable to the conditions of the case in hand. Clause N is directed against the waiver of provisions or the alterations of contract which is in existence and which has become a binding obligation between the parties. If this action were to recover on the established or admitted contract the clause and the rule of evidence and the cases cited by the defendant would be pertinent and applicable as to matters which arose after the delivery of the policies, but such is not the case here. Here the inquiry is not as to what the contract means or how it should be interpreted, or what remedy should be had on it, or how broad and deep its provisions are, but the question is far more fundamental. It is what is the contract? The bill alleged that the parties agreed upon the terms of a contract and that these terms were not inserted in the document that was delivered. This is denied by the answer, and thus is made an issue as to what the contract is. Parol evidence is ad-

MAY TERM, 1908.    645

*4 Buch.*    Sloss-Sheffield Steel & Iron Co. *v.* Ætna Life Ins. Co.

missible on this class of issues for the plain reason that in most cases no other evidence exists. To deprive the court of the benefit of parol evidence on an issue as to what the contract is, would be to destroy its jurisdiction to reform contracts and to avoid them for fraud or mistake. Vice-Chancellor Pitney says, in *O'Brien* v. *The Paterson Brewing and Malting Co., 69 N. J. Eq. (3 Robb.) 117,* concerning the rule against admitting parol evidence: "Without stopping at this moment to enumerate and classify the numerous exceptions to that rule, especially in a court of equity, it is sufficient to say that the evidence here relied upon does not tend to vary the terms of the contract. There is no contention that the complainant did not understand that he was signing an absolute promissory note in favor of the defendant, payable one day after date, and negotiable in its terms. What he does contend is that it never had any binding effect upon him in equity. To show this by parol is no more a breach of the rule invoked than it is to prove that an absolute deed is given as a mortgage, or that a promissory note is given by the maker to the payee without consideration and as an accommodation to the latter."

In other words, the rule does not apply when the inquiry before the court is what are the terms of the contract, what did both parties agree to, what were their respective rights, duties and liabilities to be when the agreement was formally committed to writing. *Continental Insurance Co.* v. *Ruckman, 20 N. E. Rep. 77 (Illinois Supreme Court)* ; *State Insurance Co.* v. *Hale (Neb.), 95 N. W. Rep. 473; Mutual Benefit Life Insurance Co.* v. *Robison, 58 Fed. Rep. 723 (Judge Caldwell)* ; *Wood* v. *American Fire Insurance Co., 149 N. Y. 382.*

The next question that arises is whether this contract of insurance can now be reformed and made to accord with the real agreement entered into between the vice-president of the insured and the general agent of the insurance company. This inquiry must be answered in the affirmative. Contracts *inter partes* may be reformed by this court whenever by reason of a mutual mistake the written instrument fails to express the agreement on which the minds of the parties met, or where

there is a mistake by one of the parties and fraud or other inequity attempted on the part of the other. Pomeroy says:

"Reformation is appropriate when an agreement has been made or a transaction has been entered into or determined upon as intended by all the parties interested, but in reducing such agreement or transaction to writing either through the mistake common to both parties or through the mistake of the plaintiff accompanied by the fraudulent knowledge and procurement of the defendant the written instrument fails to express the real agreement or transaction. In such case the instrument may be corrected so that it shall truly represent the agreement or transaction actually made or determined upon according to the real purpose and intention of the parties." *Pom. Spec. Perf.* § *870.*

In *Bryce* v. *Lorillard Fire Insurance Co., 55 N. Y. 240,* Judge Folger says: "The mistake which will warrant a court of equity to reform a contract in writing must be one made by both parties to the agreement so that the intentions of neither are expressed in it, or it must be the mistake of one party by which his intentions have failed of correct expression, and there must be fraud in the other party in taking advantage of that mistake and obtaining a contract with the knowledge that the one dealing with him is in error in regard to what are its terms." *Beach Eq. Jur.* § *544,* and following.

In *Lloyd* v. *Hulick, 69 N. J. Eq. (3 Robb.) 784,* the same rule was applied, in the opinion of Chief-Justice Gummere, but to a quite different state of facts. Here the written contract is not the one that the parties made. It is true that the insured knew that the policies as actually written did not accord with the agreement as actually made, because this fact was stated at the time the policies were delivered, but the same course had been taken the year before and the complainant had a right to rely upon the representations made by the general agent and was led to believe that the misstatement of the premium rate was a merely formal matter, and as such the statement cannot now be taken advantage of by the insurance company.

Vice-Chancellor Van Fleet, in *Cummins* v. *Bulgin, 37 N. J. Eq. (10 Stew.) 477,* defined mistake to be "The doing of an act under an erroneous conviction, which act, but for such conviction, would not have been done." Story defines it as "Some un-

intentional act or omission or error arising from ignorance, surprise, imposition, or misplaced confidence." *Story Eq. Jur.* § *110.*

It must be conceded, I think, that the insured acted under an erroneous conviction in accepting the policies containing terms which had not been agreed upon. The more invidious view would be that it was imposed upon or became a victim of misplaced confidence. Under either view it is entitled to a decree. There is a common law action pending to recover $5,400, which is claimed as the excess of premium earned over the premium paid. The insured admit an indebtedness of $3,300. In order to save further litigation the decree may provide for an adjustment of the difference, the amount of which I suppose counsel can readily agree upon.