Complainant seeks the surrender and cancellation of two policies issued by it to the defendant, based upon the latter's fraudulent procurement thereof.
As known to the record, these policies consist of an income and an accident policy, respectively. The former, dated August 1st, 1934, provides for payment to defendant, in the event of total disability, of indemnities at the rate of $200 per month for his loss of time through accidental means or sickness; the latter, dated July 24th, 1934, provides for indemnity payments, as therein specified, to defendant in case of his loss of limb or sight or other therein specified losses as a result of bodily injuries effected through accidental means. *Page 156 
Application for each of these policies was made by separate writings, each signed by defendant and each dated July 24th, 1934. Embodied in these applications, were numerous questions respecting, among other things, the applicant's present and past state of health, his previous illnesses, injuries and infirmities, as well as with respect to the medical or surgical advice and ministrations received by him during the period therein specified. Of these questions and the answers thereto, those involved in the present controversy are:
In Application for Income Policy:
"Q. Have you ever received or been refused compensation for accidental injuries or sickness, or have you any claim now pending? (Give particulars.)
A. No.
Q. Have you ever had or have you now any bodily or mental infirmity or deformity (including hernia and rupture), or have you impaired hearing, or are you in any respect maimed or in unsound condition mentally or physically. (Give particulars.)
A. Wear glasses — corrective.
Q. Have you ever had rheumatism, arthritis, sciatica, lumbago or sacroiliac strain or disease? If so, give details.
A. No.
Q. What injuries or illness or treatments by or consultations with physicians or practitioners have you had during last seven years? (Give particulars of each illness, injury, consultation or treatment; date; duration; result; and physicians name and address.)
A. Tonsillectomy — 1928 — 1 week, Dr. Bender, Paterson, New Jersey."
In Application for Accident Policy:
"Q. Is your health, sight or hearing impaired in any way; are you maimed or deformed? (If so, give details.)
A. Wear glasses — corrective.
Q. What medical or surgical advice or treatment have you had during the past seven years. (Nature, month, year; duration; result; attending physician.)
A. Tonsils out — 1928 — good. Dr. Bender."
Complainant asserts that defendant, by the foregoing answers, made representations material and fraudulent in character; and, with intent to deceive, failed to disclose that he had, during the periods embraced in said questions, sought advice and received treatments from a physician and for an *Page 157 
ailment other than and in addition to the one disclosed and in consequence of which undisclosed disability he had given notice of claim to the Mutual Benefit Health and Accident Association for indemnity disability under its policy then held by him.
That complainant in issuing to defendant the policies thus applied for relied upon the truth of the representations contained in his said answers, was testified by its vice-president, Mr. Groton. That these representations were untrue cannot be gainsaid; for, in truth, defendant had, on March 2d 4th, 6th, 11th and 17th, 1934, sought and received medical advice and treatment for a "lumbar strain" from Dr. Leroy Archbold; a fact which was testified to by that physician and, on examination, admitted by defendant himself. Although of but then recent occurrence, defendant admittedly failed to disclose any of these consultations and/or treatments in either of his said applications. His non-disclosure thereof assumes an unmistakable and added significance from the fact that he, on September 20th, 21st, 26th, 28th, October 5th, 31st, 1934, and on January 5th, 1935, had sought and received treatments from Dr. Beckwith Howarth for a "lumbo sacral sprain;" as appears from his own signed written application of January 10th, 1935, to complainant for payment to him of indemnity pursuant to the provisions of the very policies now in suit. Forcefully significant in that connection is also defendant's letter of July 25th, 1934 — written but within a day of the making of his applications for the policies in question — apprising the Mutual Benefit Health and Accident Association of his claim against it for disability benefits under the policy which he then held from it, by reason of "a back injury" suffered in the latter part of February, 1934. There is undisputed testimony from complainant's vice-president that had defendant revealed the true facts relative to these medical ministrations his applications would have been disapproved and the policies now in suit would have been declined by complainant.
The law is well settled, in this state at least, that misrepresentation or concealment by an assured in the procurement *Page 158 
of a policy of insurance, if fraudulent and material to the risk, will avoid the policy obtained on the faith thereof. Kozlowski
v. Pavonia Fire Insurance Co., 116 N.J. Law 194; Clayton v.General Accident, c., Assurance Corp., 104 N.J. Law 364; HudsonCasualty Insurance Co. v. Garfinkel, 111 N.J. Eq. 70; Kerpchak
v. John Hancock Mutual Life Insurance Co., 97 N.J. Law 196;Prahm v. Prudential Insurance Co., 97 N.J. Law 206; Guarraia
v. Metropolitan Life Insurance Co., 90 N.J. Law 682; Duff v.Prudential Insurance Co., 90 N.J. Law 646; Brunjes v.Metropolitan Life Insurance Co., 91 N.J. Law 296; McAuliffe v.Metropolitan Life Insurance Co., 93 N.J. Law 189; Anders v.Supreme Lodge, Knights of Honor, 51 N.J. Law 175.
The interrogatories hereinabove set forth were not ambiguous. By them complainant neither sought nor solicited defendant's opinion or impressions, but asked for and requested of him a statement of facts, whereof he had definite knowledge. His truthful averments in those respects would have undoubtedly put complainant on guard and further inquiry relative to the undisclosed "lumbar strain" and consequent treatments by Dr. Archbold in March, 1934, and in all probability would, as was testified by its vice-president, have resulted in its disapproval of the applications and refusal to issue the policies in question. The answers as thus made by defendant averred that he had not, Dr. Bender excepted, consulted or received treatment from any physician during the then preceding seven years. The established fact, as found, however, contradicted that averment and representation.
Viewed in the light of the foregoing, the conclusion is inevitable that defendant's said representations and non-disclosures unquestionably were fraudulent and made with knowledge thereof for the purpose of having complainant act in reliance thereon. This the complainant did to its resultant injury; hence it unquestionably is entitled to the relief which it now seeks. United Life and Accident Insurance Co. v.Winnick, 113 N.J. Eq. 288; Locker v. Metropolitan LifeInsurance Co., 107 N.J. Law 257; Metropolitan Life Insurance *Page 159 Co., v. McTague, 49 N.J. Law 587; Dewees v. ManhattanInsurance Co., 34 N.J. Law 244.
Defendant, however, attempts to meet and surmount the force and inevitable legal effect of these facts by proof that he did not conceal, but on the contrary truthfully answered and disclosed to Dr. E.J. Phelps, complainant's medical examiner, the fact that he had visited and received treatments from Dr. Archbold, but that Dr. Phelps didn't write it down upon the application; and hence complainant should be denied the relief which it seeks.
But on the assumption that the fact as respects the disclosure was as claimed by defendant and that evidence thereof was competent, although Franklin Fire Insurance Co. v. Martin,40 N.J. Law 568, holds to the contrary, it is indeed difficult to perceive how complainant can be estopped from setting up the falsity of the answers contained in defendant's applications or how, in the face of complainant's position, any rights upon the policies ever accrued to defendant. It is needless to point out that Dr. Phelps was without authority from complainant to falsify the answers to the questions which he was required to propound to defendant; and that, even if he did so falsify, defendant could acquire no right by virtue thereof; because, in that event, defendant would be placed in the anomalous position of making false representations in order to secure the policies in question which, upon a truthful report, he undoubtedly would not have obtained. By these misrepresentations complainant was unquestionably imposed upon and induced to issue the policies here in issue, and in consequence of which, even assuming that both parties had acted in good faith, justice would require that the policies be canceled and the premiums returned.
But the case as presented by the record is by no means as favorable to defendant as is thus assumed. It was defendant's duty to read the questions and answers contained in the applications which he signed. Crescent Ring Co., Inc., v.Travelers' Indemnity Co., 102 N.J. Law 85. He knew that upon them the policies would be issued; if they were issued at all. Hence, it must be presumed that he read and was fully cognizant *Page 160 
of the conditions and limitations therein expressed. The power of the medical examiner was expressly limited and notice thereof was given by embodiment in the application, which defendant was required to make and sign, of a covenant on his part "that the company shall not be charged with knowledge on the part of any agent, medical examiner or other representative of information called for by any question contained in this application, unless made a part hereof or endorsed hereon."
There is yet another view of this case fatal to a recovery, even assuming the facts appertaining to the alleged disclosure were as claimed by defendant himself. The alleged failure or omission on the part of Dr. Phelps to have written in on the application the name and treatments of Dr. Archbold is a fact that would be at once disclosed by the copy of the applications, annexed to the respective policies in suit, to which defendant's attention was called by the language of the policies themselves. Under the circumstances it was incumbent upon him to promptly examine the policies, whereupon he would have discovered that a fraud had been perpetrated, and to promptly notify complainant of that fact and his refusal to accept the policies as written.Crescent Ring Co., Inc., v. Traveler's Indemnity Co., supra, which he admittedly failed to do. He could not hold the policy without approving the action of the medical examiner and thus becoming a participant in the fraud so committed. His retention of the policy from the time of its issuance to now is tantamount to an approval of the application and statements therein contained, the legal consequence of which approval he cannot, and should not, now be permitted to avoid. Crescent Ring Co., Inc., v. Travelers' Indemnity Co., supra; Sardo v. Fidelity andDeposit Co., 100 N.J. Eq. 332; Berkowitz v. Westchester FireInsurance Co., 106 N.J. Eq. 238; Richardson v. Maine InsuranceCo., 46 Me. 394; American Insurance Co. v. Neiberger,74 Mo. 167.
Moreover, the true aspect of the case is not as favorable to defendant as that hereinbefore assumed. Defendant claims that he did not conceal, but on the contrary truthfully made *Page 161 
known and disclosed to Dr. Phelps, his visits to and treatments from Dr. Archbold, but that the former didn't write it down on the applications, which he (defendant) subsequently signed. In support of his claim, he invokes his own testimony and that of his witnesses, Richard J. Maroff (the agent who solicited the insurance in question) and Morris Shapiro (an employe of defendant), who it is claimed were both present at defendant' medical examination and interrogation by Dr. Phelps. Both of these witnesses testified that they heard defendant, in response to Dr. Phelps' question, tell the doctor that he had consulted and had been treated by Dr. Archbold. This, however, was vigorously and unqualifiedly denied by Dr. Phelps, who testified that no one but defendant and himself were present on that occasion; that he wrote down all of the answers to the questions as they were then given to him by defendant; that defendant didn't tell him that he had ever consulted or been treated by any physician, other than Dr. Bender; that after having read the questions and written down the answers thereto, he gave defendant the application, who in his presence then read, signed and returned it to him whereupon he forwarded it to complainant's office at Newark, New Jersey.
In his direct examination, defendant testified that it was about five o'clock in the afternoon when Richard J. Maroff and Dr. Phelps came to his place of business and it was then while they sat around his desk that he answered the questions read to him from the application which he thereafter signed. But on cross-examination, he changed and said that it was Richard J. Maroff, one of his brothers, his bookkeeper and other persons then in his office who were present on that occasion; that he was unable to say whether those answers were in the handwriting of Mr. Maroff or Mr. Shapiro, but assumed that it was in the latter's. On further cross-examination, however, he contradicted himself by saying that neither Mr. Shapiro nor his brother, George, but only Dr. Phelps, Mr. Maroff and himself, were then present.
When called by defendant, Richard Maroff testified that he recalled having been present at the time that Dr. Phelps examined *Page 162 
defendant and that he then heard the latter tell the doctor that he had been to see Dr. Archbold about some condition which he thought was a cold. Under cross-examination, this witness, however, admitted having been an agent for complainant for about six years prior to the occasion in question; that he was familiar with complainant's rule requiring examinations of policy applicants to be made in private by one of its regularly appointed medical examiners, at which the presence of any agent or other third person was forbidden, but that he nevertheless was present at that examination and that he did nothing to apprise complainant of defendant's treatment by Dr. Archbold; a fact which he knew didn't appear on either of the applications, although he was fully aware of the fact that the policies were issued upon the facts disclosed in the answers appearing thereon.
Morris Shapiro, when called by defendant, testified that he acted generally for defendant in connection with insurance matters; that he was present on the occasion when the questions were asked and the answers given in connection with the applications; and that he did not write the answers to the questions on either of those applications.
A consideration of the foregoing and other discrepancies and contradictions in and between the testimony of defendant and his own witnesses, the absence of any purpose or motive on the part of Dr. Phelps for refusing to write down on defendant's application the name of Dr. Archbold along with that of Dr. Bender, as compared with the obvious purpose to be served by defendant's non-disclosure in that respect; and the impelling fact that in the application for the accident policy which defendant made and signed on the same day — and with the preparation of which Dr. Phelps admittedly had nothing whatsoever to do — defendant also failed to disclose the fact that he had ever consulted or been treated by Dr. Archbold or any other doctor, excepting Dr. Bender, cannot justify any conclusion other than that the defendant designedly failed to disclose that fact, as Dr. Phelps testified, and as I, from the evidence, find.
There will be a decree requiring the surrender and cancellation of the policies and the return of the premiums paid. *Page 163