31 N.J. Super. 424 (1954)
107 A.2d 46
MILLHURST MILLING & DRYING COMPANY, A BODY CORPORATE OF THE STATE OF NEW JERSEY, PLAINTIFF-APPELLANT,
v.
AUTOMOBILE INSURANCE COMPANY, A BODY CORPORATE, AND PIEDMONT FIRE INSURANCE COMPANY, A BODY CORPORATE, DEFENDANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued June 21, 1954.
Decided June 30, 1954.
*427 Before Judges CLAPP, SMALLEY and SCHETTINO.
Mr. Theodore D. Parsons argued the cause for plaintiff-appellant (Messrs. Parsons, Labrecque, Canonza & Combs, attorneys).
Mr. Marshall Crowley argued the cause for defendants-respondents (Messrs. Toner, Crowley, Woelper & Vanderbilt, attorneys).
The opinion of the court was delivered by SMALLEY, J.A.D. (temporarily assigned).
This is an appeal from a judgment of the Law Division rendered in favor of the defendants in an action commenced by plaintiff to recover on identical policies of fire insurance issued by defendants to the plaintiff.
The plaintiff is a family corporation carrying on the business of merchandising building materials, feed and grain, hardware, and milling, and in addition, engages in the salvaging of property damaged in marine and fire losses.
*428 Plaintiff insured its property with various companies, and in April of 1948, at the suggestion of one Wigdortz, an insurance agent, who undertook to secure a single policy covering all the buildings, placed its fire risk with defendants' predecessor, Continental Insurance Company. In order that a single policy for all the risks be obtained, Wigdortz called in a special agent of Continental, one Carling, to inspect the risks and secure a re-rating. After recommendations for correction of certain "housekeeping" conditions had been made, and evidently complied with, a revision was made by the Fire Insurance Rating Organization. It is noted that this entire process was commenced so that the lowest possible rate could be obtained for the risks involved. In furtherance of this general desire on the part of the plaintiff, the policy finally issued by Continental contained the following warranty:
"In consideration of the reduced rate at which this policy is written it is hereby warranted by the insured that the dryer located in Building 6A will not be used. This warranty supersedes any other privilege in conflict therewith contained in the policy."
Thus, the making of this warranty by the plaintiff was a condition precedent to the effectuation of a lower rate.
However, there appears to have been a further agreement concerning the use of the dryer made between one Hochberg, secretary of the plaintiff corporation, Wigdortz and Carling to the effect that the dryer would not be used unless the company were first notified. This arrangement was not part of the policy issued, but plaintiff claims it was its understanding concerning the dryer's use, and on each occasion that the dryer was used plaintiff notified Wigdortz. Also, plaintiff's secretary admitted that he had never read the provisions of the policy, and therefore was unaware of the warranty contained therein, but rather assumed that the extrinsic agreement with Wigdortz and Carling was the existent and controlling factor as to the dryer's use.
In November of 1949 Continental decided to surrender part of plaintiff's risk, and Wigdortz, who also represented the *429 defendant companies, negotiated for each of them to assume one-sixth of the coverage. The warranty contained in the original policy was included in the policies that defendants issued, and it is uncontroverted that Wigdortz did not advise either defendant of the extraneous arrangement between plaintiff's secretary, Hochberg, Carling, and himself concerning the use of the dryer. Wigdortz did, however, tell Hochberg that the conditions would remain the same, although three companies were now carrying the risk instead of one.
On June 9, 1950, after 18 continuous hours of operation of the dryer in building 6 A, a fire occurred and caused in excess of $100,000 damage.
Although it is agreed that neither defendant had notice of the private agreement either before or after becoming insurers for the plaintiff, further that neither had notice of any use of the dryer, plaintiff, nevertheless, sued on the policies for the damage caused by the fire. Defendants answered by pleading breach of the express warranty on the part of the plaintiff; plaintiff replied that defendants waived the breach by ratification of Wigdortz's agreement by acceptance of premiums, and further, that the policy should be reformed in accordance with the alleged agreement on the ground of unilateral mistake and inequitable conduct on the part of defendants.
The trial court found that no notice of use of the dryer was sent to Wigdortz subsequent to the effective date of defendants' policies, and therefore, there could not be an effective waiver by the defendants, and further, that plaintiff's proof was not of the quality to be considered clear and convincing, and therefore would not warrant the remedy of reformation, and dismissed the suit. It is from this disposition that plaintiff appeals.
The crux of appellant's argument centers on the proposition that an agent of defendants, Wigdortz, had complete knowledge of both the ancillary agreement concerning the use of the dryer and notice of the exact instances when it would be used. From this hypothesis appellant reasons that *430 knowledge and notice to an agent is effective knowledge and notice to his principals, the defendants. Therefore, appellant concludes that defendants had knowledge of the arrangement coupled with notice of use, accepted the premiums, did not cancel the policy, and hence waived any breach of warranty, if one, in fact, existed.
Superficially this line of reasoning may seem convincing. However, a short excursion beneath the congeries of facts reveals its hollowness.
The original policy with Continental was issued in March of 1949, retroactive to November 1948 for one year. It was the culmination of much negotiation, the prime purpose of which was to secure as low a rate as possible.
In January of 1949 Carling, the special agent of Continental, wrote a letter to plaintiff's secretary, a pertinent part of which stated:
"In order that this building can be included in the Lumber Yard schedule it will be necessary for you to write the Fire Insurance Rating Organization at 31 Clinton Street, Newark 2, N.J. for the attention of Mr. R. Wesmer informing them that you will accept a policy in which it is warranted that your dryers are not to be used." (Italics supplied)
Hochberg complied with this request and wrote the Fire Insurance Rating Organization the next day as follows:
"This letter will warranty to you and your department the following information with regard to building No. 6 of our Millhurst Plant. The drying equipment in this building will not be used unless the insurance company is notified first of this use.
Since putting this equipment in Building 6 A the major of our business has changed and therefore there is very little chance that we will use the machinery."
There is no evidence that Continental ever had actual notice of the arrangement concerning the dryer's use, and this is bolstered by the fact that the policy was issued after the alleged agreement and contained the express warranty against the dryer being used at all. It therefore follows that *431 defendants, who did not become insurers until almost a year later, did not know of any provisions contrary to the warranty, and it is uncontroverted that Wigdortz did not advise either defendant of his conversations leading up to the issuance of the original policy. Further, the notices given by plaintiff to Wigdortz when the dryers were going to be used were all before the defendants became parties to the policy.
Thus, in order for appellant's argument to prevail, it must be shown that the knowledge of the agent, Wigdortz, is imputable to and binding on his principals, the defendants.
A leading case concerning this principle is Sooy v. State, 41 N.J.L. 394 (E. & A. 1879) in which Dixon, J., stated the rule to be:
"That is, that the notice must come to the agent while he is concerned for the principal, and in the course of the same transaction, and if he have notice only by some other transaction, foreign to the business in hand, this will not affect the principal. * * * whenever the principal, if acting in the matter for himself, would have received the notice, the knowledge of his agent shall be chargeable to him. * * * But if the principal, or an agent ignorant at the time of his employment of the fact with notice of which it is sought to charge the principal would not have been apprised of that fact, I do not perceive why third parties should acquire any unexpected rights against the principal from the mere knowledge of an agent not communicated to him, even supposing the agent's duty to his principal required the disclosure to him of that knowledge." (Italics supplied)
This rule has been followed in Altshuler v. New Brunswick Fire Ins. Co., 114 N.J.L. 442 (E. & A. 1935); Vulcan Detinning Co. v. American Can Co., 72 N.J. Eq. 387 (E. & A. 1907); Borough of Deal v. Sieling, 102 N.J.L. 585 (E. & A. 1926); Hanford v. Duchastel, 87 N.J.L. 205 (E. & A. 1915); Reiners v. Hawthorne, 109 N.J. Eq. 60 (Ch. 1931); Driscoll v. Burlington-Bristol Bridge Co., 8 N.J. 433, 481 (1952).
Applying this rule to the facts in issue, we fail to see how defendants could have possibly learned of the content of the *432 tri-party agreement between Hochberg, Carling and Wigdortz, if they acted for themselves. Both the element of time and the indefiniteness of concrete terms dictate directly to the contrary, in addition to the expression of the warranty in the policy they assumed of a diametrically opposed effect.
The knowledge of the agent in the present case was acquired substantially before defendants were in any wise concerned with the plaintiff. To impute this knowledge to the principals would be contrary to the well-settled rule that an agent must obtain the knowledge or notice while acting within the scope of his authority, and only then will his knowledge be imputed to his principal. In addition to the Sooy case, supra, this rule has been followed in Wallhauser v. Rummel, 25 N.J. Super. 358, 374 (Ch. Div. 1953); Stretch v. Watson, 6 N.J. Super. 456, 471 (Ch. Div. 1949); Centerville B. & L. Assn. v. Gollin, 117 N.J. Eq. 412 (E. & A. 1935); Bridgeton National Bank v. Hepner, 104 N.J.L. 7 (Sup. Ct. 1928).
The knowledge of Wigdortz was not acquired during the course of and within the scope of the agency relationship with defendants, the agent had no authority to bind the defendants when he committed his officious act by promising unauthorized coverage, defendants were never apprised of the transaction and therefore, plaintiff's contention that defendants waived the breach of warranty must, of necessity, fail. As was stated in the trial court, "It may well be that Continental is bound by the acts of the agent because its field agent, Carling, participated in the agreement, but nowhere is it suggested that Carling had any right to bind either of the defendants." However, that question is not before us as Continental is not a party to the present suit and therefore its liability will not be discussed. We do, however, concur in the trial court's holding that "The court holds as a matter of law Wigdortz's knowledge of the agreement is not chargeable upon either of the principals."
We next turn to plaintiff's claim that by reason of his unilateral mistake and defendants' inequitable conduct a *433 case of reformation is made out, and therefore, the policy should be reformed to read as follows:
"It is hereby warranted by the assured that the dryer located in Building 6 A will not be used without notice to and consent of the company and readjustment of rate. This warranty supersedes any other privilege in conflict therewith contained in the policy."
The alleged unilateral mistake consists of plaintiff's misconception of the contents of the policy, and this was caused, according to plaintiff's own admission, by Hochberg's failure to read the policy until after the fire occurred causing the damage.
The inequitable conduct on the part of defendants is averred to consist of defendants retaining the benefits accrued to them through the misconception of coverage as to the dryer, induced by defendants' agent.
Equity will reform a contract in the case of a mistake of one party, accompanied by fraud or other inequitable conduct by the other party. Forman v. Grant Lunch Corp., 113 N.J. Eq. 175 (E. & A. 1933); Chelsea National Bank v. Smith, 74 N.J. Eq. 275 (Ch. 1908); Sloss-Sheffield Steel & Iron Co. v. Aetna Life Ins. Co., 74 N.J. Eq. 635 (Ch. 1908), reversed on other grounds, 75 N.J. Eq. 545 (E. & A. 1909); Volker v. Connecticut Fire Insurance Co., 22 N.J. Super. 314, 321 (App. Div. 1952).
To support reformation, a high order of proof is required. It must be "clear, cogent and convincing," or "clear and conclusive." The cases are numerous and uniform. Ehnes v. Monroe Loan Society, 120 N.J. Eq. 599 (E. & A. 1936); Heuer v. Rubin, 1 N.J. 251 (1949); Asbestos Fibres, Inc. v. Martin Laboratories, Inc., 12 N.J. 233 (1953). Courts of equity do not grant the high remedy of reformation upon a probability, or even upon a mere preponderance of evidence, but only upon a certainty of the error. 2 Pom. Eq. Jur. § 859, 1 Story Eq. Jur. § 157. Anderson v. Anderson Food Co., 66 N.J. Eq. 209, 224 (Ch. 1904), affirmed 67 N.J. Eq. 730 (E. & A. 1904).
*434 To prevail on the ground of reformation appellant would have to prove clearly, convincingly, and conclusively: (1) that the original agreement between Hochberg, Carling, and Wigdortz contained definite, specific, and precise terms concerning use of the dryer and insurance coverage while so used; (2) a similar arrangement with equal specificity when defendants issued their policies. A careful reading of the record discloses nothing more than an exchange of conversation and correspondence in very general terms, regarding the use of the dryer and notice of its use. Appellant was informed by a letter from Carling that it would have to warrant the dryer would not be used in order to obtain the desired rate. However, it is alleged that Hochberg was told that he might use the dryer upon giving proper notice. Whether this was sales talk, puffing, or intentional misrepresentation is not clear. The record is replete with conflict on this issue and nebulous as to the time and persons to notify, whether consent would have to be obtained before use, and of utmost significance was the surreptitious compact intended to remain intact when defendants agreed to assume part of Continental's undertaking. Balancing these vague uncertainties against the warranty explicitly contained in the policy, coupled with appellant's failure to ever read the policy, leaves something to be desired regarding the quality of proof necessary to effectuate a reformation.
Reformation on the ground of mistake is not granted in equity where the mistake is the result of the complaining party's own negligence. Each instance of the alleged negligence must depend to a great extent upon its own circumstances. 3 Pomeroy's Equity Jurisprudence 339; Mullen v. Cronan, 90 N.J. Eq. 392 (Ch. 1919); Dupont Chemical Co. v. Buckley, 96 N.J. Eq. 465 (Ch. 1924); Rauh v. Bick, 108 N.J. Eq. 1 (Ch. 1931).
Where the mistake is wholly caused by the want of that care and diligence in the transaction which should be used by every person of reasonable prudence, and the absence of which would be a violation of a legal duty, equity will not *435 interpose its relief. Dupont Chemical Co. v. Buckley, supra. Riggle v. Skill, 9 N.J. Super. 372 (Ch. Div. 1950).
This rule is particularly applicable to the duty imposed upon an insured to examine his policy upon receipt, and if its terms are found to deviate from the original contract agreed upon, to notify the insurer immediately and refuse to accept the policy.
In the case of Crescent Ring Co. v. Travelers Indemnity Co., 102 N.J.L. 85 (E. & A. 1926), the Court of Errors & Appeals in an opinion by Chancellor Walker quoted from New York Life Insurance Co.. v. Fletcher, 117 U.S. 519, 6 S.Ct. 837, 29 L.Ed. 934 the following:
"The court, after observing that when the application does not attempt to set forth all the provisions which the policy to be issued must contain, and the agent represents that the policy will contain certain stipulations which are not unlawful, then the policy must contain them, or the assured would not be bound to accept it: `But in such case,' said the court, `it will be the duty of the insured, when he receives the policy, promptly to examine the same, and, if it does not contain the stipulations agreed upon, to at once notify the company of such fact and of his refusal to accept said policy.'"
Quoting from Metzger v. Aetna Ins. Co., 227 N.Y. 411, the opinion further states:
"`If the insured obtained or held a mistaken view or belief concerning the agreements of the policy, the fraud or negligence of its president and representative was the cause. A mere reading of the policy would have made him and the plaintiff know the agreements the plaintiff was accepting and entering into. To hold that a contracting party, who, through no deceit or overbearing inducement of the other party, fails to read the contract, may establish and enforce the contract supposed by him, would introduce into the law a dangerous doctrine. Of course the doctrine does not exist.'
Now, even if it were to be held that the declarations of Nearing were `deceit and overbearing inducement,' that would not have excused the officers of the ring company from reading the contract of insurance, because, as was proved in this case, the fraud, such as it was, was not perpetrated by the indemnity company the other party, nor was it authorized by it, nor did it afterwards, with knowledge, ratify it. In this case the ring company, before accepting the policy, was perfectly at liberty to examine it and to call in a lawyer or an insurance expert to advise them as to the meaning of its *436 terms, and the extent of the indemnity company's liability. This they did not do.
While one sued for fraud cannot set up as a defense that, if the plaintiff had exercised reasonable care, he would not have been defrauded; yet, where no active wrong-doing is attributed to the principal defendant, and reliance is placed upon the fraud of an agent, who was not instructed, or actually or impliedly authorized, to commit it, there can be no recovery by a plaintiff who could have protected himself by examining into the character of the transaction and the truthfulness of the representations made, unless the defendant, with knowledge, ratifies it; and this the indemnity company did not do."
The affirmative duty of the insured to read his policy has been similarly expressed in Citizens Casualty Co. of New York v. Zambrano Trucking Co., Inc., 140 N.J. Eq. 378 (Ch. 1947), affirmed 141 N.J. Eq. 310 (E. & A. 1948); Berrien v. New York Life Ins. Co., 132 N.J.L. 159 (E. & A. 1944); Berkowitz v. Westchester Fire Ins. Co., 106 N.J. Eq. 238 (E. & A. 1930); Sardo v. Fidelity, etc., Co. of Maryland, 100 N.J. Eq. 332 (E. & A. 1926); Pacific Mutual Life Ins. Co. v. Rosenthal, 122 N.J. Eq. 155 (Ch. 1937); By-Fi Building & Loan Assn. v. New York Casualty Co., 116 N.J. Eq. 265 (Ch. 1934); Mesce v. Automobile Association of N.J., 8 N.J. Super. 130 (App. Div. 1950).
Particularly apropos is the following from By-Fi Building & Loan Assn. v. N.Y. Casualty Co., supra:
"With respect to the predicament in which complainant presently finds itself, suffice it to say that such is peculiarly of its own making and the result of its own inexcusable carelessness. Upon receiving the policy it was under a clear duty to promptly examine it, and, if found not to be in conformity with the terms agreed upon, as believed by it, to notify the insurance company thereof, as well as of its refusal to accept the policy in that form. * * * This, through no fault of the defendant, it failed to do, although in possession of the policy for almost three weeks before the occurrence of the accident. Not having done so then, it cannot now  after the status of the parties to the policy has been so changed as to preclude their being restored to their former respective positions  be heard to plead or complain of the alleged mistake."
In the case sub judice appellant's secretary neither read the original policy issued by Continental nor the policies *437 later issued by defendants until after the fire occurred and the loss had been sustained. Certainly a strong inference of neglectfulness, carelessness, and utter disregard of duty has been demonstrated by such conduct.
Appellant relies heavily on Volker v. Conn. Insurance Co., 22 N.J. Super. 314 (App. Div. 1952) and Nazarro v. Globe & Republic Ins. Co., 122 N.J. Eq. 361 (Ch. 1937), affirmed 127 N.J. Eq. 279 (E. & A. 1940), in support of its position. In the Volker case, the court, after citing authority for the proposition of the above-mentioned duty of an insured to examine his policy, stated:
"These are all cases where the insurance policy was actually delivered into the hands of the insured. Such is not the case here. For plaintiff to be barred from obtaining reformation on the ground that he should have read the policy, it must have been delivered to him. Dein-Bacher, Inc. v. U.S. Fidelity, etc., Co., 115 N.J. Eq. 205 (E. & A. 1934)."
The present case is thus patently distinguishable by the fact that appellant had possession of the policy for more than a year, whereas in the Volker case there was never a delivery of the policy.
In the Nazarro case the mistake resulted from a misconception on the part of the insured of the interpretation of the words "vacant or unoccupied," after the insured had received and read the policy, and thereafter questioned the agent as to their meaning. The difference in the factual situation in the instant case is so vast that any discussion is unnecessary beyond the notation that the degree of care exhibited by the insured in the Nazarro case was infinitely more assiduous and could be characterized as prodigious when compared with the absolute inaction of the appellant.
It is therefore apparent, due to the significant dissimilarities of these two cases, that the principles for which they stand are wholly inapplicable to the present situation.
The most recent expression of the New Jersey rule dealing with inequitable conduct on the part of an insurance agent *438 may be found in Heake v. Atlantic Casualty Ins. Co., 29 N.J. Super. 242 (App. Div. 1954), affirmed 15 N.J. 475 (1954). In that case the insured, a 17-year-old boy, when solicited for insurance, told the agent his correct age. The insured signed a blank form, the agent assuring him all would be taken care of and that he was covered. However, the agent reported to the company that the insured was 23 years old and that is the age that appeared on the policy with a warranty to the effect that the insured had been driving more than one year. This fact also was misstated by the agent to the company, the agent being informed that the insured had an "initial" driver's license. An accident occurred in which the insured was implicated, and the company denied liability on the grounds that the insured made false representations, breach of warranty, and failure to read the policy after delivery, and inform the company of the difference between the existent facts and those contained in the policy. The court held in favor of the insured, and after stating the general rule relating to the duty to read the policy, held the facts involved warranted an exception because (1) the language of the policy itself was ambiguous, (2) only knowledge which would come to a reasonably intelligent person upon reading of the contract is imputed to a policy holder, and (3) the inexperience and lack of business acumen of a 17-year-old boy was taken advantage of by superior knowledge and unconscionable conduct of the agent.
We are of the opinion that this case, too, can be clearly distinguished from the instant case. We have examined the policies in question, and unlike the ambiguous, complex, and confusing terms in small print, multi-paged, and incomprehensible language of the policy in the Heake case, here the policies were of standard size, most legible, pertinent provisions were typewritten, and the warranty conspicuously displayed. The language of the warranty was explicit and capable of only one interpretation. It was most unambiguous and unequivocal. The most inexperienced and uninitiated individual would have no difficulty comprehending its import *439 and meaning. The appellant's secretary, Hochberg, was a mature and experienced man, an officer of a corporation whose responsibilities, by their very nature, involved commercial, financial, and economic activity. He had been associated with corporate affairs for 30 years, and readily admitted that he handled the insurance matters for the firm. If the slightest effort had been made, Hochberg could not have avoided seeing and understanding exactly what was warranted. There being a complete absence of any pertinent facts closely approximating an anology between this and the Heake case, we conclude that it cannot come within the narrow but valid exception to the general rule.
Affirmed.